I'm Jim Connor from the firm of Calhoun, Bellow, and Seacrest, representing the plaintiff appellants. In this matter, Judge Richardson, Judge Rushing, Judge Leiden, we appreciate your attention this morning. This is a case about the Clean Water Act, about the discharge of pollutants into the waters of the United States, and your honors, contrary to the briefing from the appellees, this is right down the middle of the fairway under the Clean Water Act. This is not an aberration, this is not stretching the act in any way, this is not finding an obscure provision buried in the act and trying to expand it. This is right down the middle of the fairway. Has the EPA ever granted a Clean Water Act permit to a shrimping vessel? I do not know the answer to that. Are you aware of any instance in which it has? I am not aware. I am not aware of the shrimping vessel applying for one, I am not aware of the EPA either granting or denying that application. The Clean Water Act, as your honors know, is set up with a citizen supervision, that is how we are here. And the courts refer to that as a provision under which citizens get to be private attorneys general. These cases usually, not always, but usually involve a situation where EPA has not previously acted, that is why the citizens spend the money, hire the lawyers, get involved, because So this case is not exceptional in that sense, because that is why they exist, these citizens. And the next logical question, I do not know if it is on your honors' minds, but it seems to be a next logical question, is how did they miss this? This seems like kind of a big deal. Who knows is one answer, but the better answer is they are a small agency. If you look at their percentage of the budget, it is tiny. They have a lot on their plate, lots of different laws, and they routinely miss things like this. They routinely miss areas that are fairly localized and are not factories. So the fact that EPA has not acted is not very telling, if you will. Now when I say it is right down the middle of the fairway, what I am talking about, and I don't want to be repetitive, but I just very quickly want to say that the Act prohibits the discharge of any pollutant by any person. It then defines pollutant to name several things, dredge, spoil, solid waste, incinerated residue, sewage, garbage, sewage sludge, munitions, chemical waste, biological materials, and it goes on, it mentions rock, sand, cellar dirt. This is intentionally a very broad definition. Putting rocks into the water is a discharge of a pollutant. Are you still arguing, I think below the argument was that bycatch includes live fish and dead fish, that both of those are pollutants. On appeal, your brief seemed to mostly focus on dead fish, and I wanted to clarify if your argument has been refined or you are just focusing on that because it is just one example. Are you still arguing that putting live fish back in the water is a pollutant? Judge Washington, that is an excellent question. Thank you for asking it. We are focused on dead fish, and I look back at our complaint because you are right, the briefing and the district court decision got off into live fish, but if you were to look at our brief paragraphs 41, 45, and 47, if I remember correctly from memory, we talk specifically about dead fish being discharged. We talk about decimation of the juvenile. You are not arguing that live fish are a biological material? That is correct. Only dead fish are a biological material. We are only arguing that the discharge of dead fish into the waters of the United States is a violation of the Clean Water Act. How do I make that decision? It seems like such a broad term. That is a good point. We certainly know that live fish in some instances have been found to be biological materials. Honestly, we would be perfectly happy with the decision from this but what we are concerned about is the dead fish. They are the ones that actually pollute the water in a common sense kind of way. Live fish don?t pollute the water in a common sense kind of way. We have U.S. Perg v. Atlantic Salmon from the District Court of Maine. It is not binding on this Court, obviously, but it says the release of non-native salmon species is a discharge of biological material. It is a well-placed question. Our concern and what we are asking this Court specifically for is a ruling that the discharge of thousands of tons of dead fish into our waters, specifically Pamlico Sound, but any of the waters of the United States, is a violation of the Clean Water Act. Can you help me understand that a little bit? I think Judge Rushing, I too think it was an excellent question. Thank you. I have a little bit of a hard time understanding that because you began by saying that the word pollutant is defined in the statute to mean, not to include, but to mean a whole list of things, including rocks and heat and biological material. What I am having a little bit of a hard time understanding is what about killing a fish moves it from non-biological material to biological material? It strikes me that it is biological material when it is dead, if I apply the natural understanding of that phrase in isolation. You are trying to suggest to me that I should read it more narrowly, but help me understand why I should do that. I will be frank and say this is a line of questioning I was not expecting. I was expecting to be questioned about why I wanted it to be so narrow. I think both live fish and dead fish are both in the common understanding of things, biological materials. Again, our focus is on the dead ones, but we have no objection to the court finding that it includes both live and dead. Can you talk to me a minute about heat as well? If I run an outboard motor on my John boat in a river or estuary or the ocean, by definition that outboard is putting heat off. Is that a discharge of a pollutant into the water under your understanding of heat? Well, great question. Honestly, I have not thought about the heat part so much, but what that goes to generally is the principle that is true in all of the environmental laws. For better or for worse, that is what I have been doing for 37 years is environmental law. That is why we are asking you these questions. These laws are broadly worded, and they include rocks and sand. Was a kid standing on the shore throwing a rock in the water? Is somebody going to swoop in from EPA and snatch him up and make him get a permit? No. Your view is they could, right? So when my nine-year-old girl skips a water across the pond, maybe that is not navigable, but if I do it at the ocean, at least, that the EPA indeed could cite her for violating the Clean Water Act because she is discharging a rock into the water by skipping it across because it stops eventually. She cannot get it all the way across the ocean. It goes in. That is right. That is a great question, and again, it goes to the very fundamental nature of how these laws work. It works that way because your point is the EPA, in its sole discretion, just gets to decide whether my daughter walks free or not. It is just up to the EPA administrator just gets to decide, hey, Landry, you are good or you are not good, right? They just get that full discretion, and that is the reading that you are putting forward. Or to take the same example, if she baits a hook with a worm and throws it in the water. Well, Your Honor, it is both true, what you are saying, and a good illustration, again, of how these laws work because there is no question that a rock is a rock. I mean, it says rocks, and so if your daughter throws that rock, that is a rock. There is no ambiguity there, and yet, that is not something EPA is worried about. The administrator does not. Well, they might not be worried about it today, but when they find out that my daughter is doing it, they might become worried about it, and there is nothing that you can do about it, right? So if I ride a boat, if I am in a boat at all, inboard or outboard, I am putting heat out, right? If I skip a rock, if I fish, if I crab, if I am the South Carolina Department of Natural Resources and I stock a require a permit or subject yourselves to a sanction. No, sir. None of those things require a permit, and it is because that is the way the statute is set up. That is what Congress put in front of us. Is the Clean Water Act... Wait, none of those require a permit? I may have missed one, Your Honor, but certainly you running your outboard engine off your... I am putting heat into the navigable waters, right? My daughter is putting a rock into the navigable waters. It is adding to the navigable waters. She picked it up in the mountains, she carried it down to the coastline, and she tossed it in. Yes, sir. Yes, sir. I understand the hypothetical. It is within EPA's discretion, as you said earlier, to decide where they draw these lines. As we know, there have been court cases where their decision to draw a line here or there is challenged. Incidental fallback is a great example of that, where they did not have an exception for incidental fallback, and the court said they had to, the Tulloch case. So they had to go back and revise the rule and make an exception or an exemption for an incidental fallback. You know, the practical way that this works, I mean, here in a courtroom, we can get up in our heads and think, well, gosh, a rock or an outboard motor. And it is true. You are absolutely right. But in the real world, that is not something anybody is concerned about. My sons flew through rocks. Well, they are grown now, but they used to throw rocks in the water. I have a boat. It discharges heat into the water. Can you spend a few minutes in light of this discussion, taking this discussion into context, and talk to me a little bit about why you think the major questions doctrine does not apply under West Virginia v. EPA? Yes, sir. Yes, sir. The major questions doctrine does not apply for a couple of reasons. First, this is not on the level that the Supreme Court was talking about in West Virginia. That is every boater, fisherman, rock skipper that exists in America. Like, that is not broad enough for you. Well, let me move back to what this case is actually about, which is dead fish being discharged in large volumes into the water. That is what this case is about. Now, we may all have a quarrel with the Clean Water Act and what Congress did with the can be interpreted that broadly. In fact, I don't know how else you interpret rocks. Rock is a rock, like I said earlier. Hasn't the Supreme Court told us? I mean, in train, the Supreme Court refused to interpret pollutant to the outer boundaries of the word. They have told us that it requires looking not just at the dictionary, right? Well, not just the dictionary, but it also requires from EPA and what it has done since 1972, what's that, 50 years, is to look at situations that need enforcement and situations that don't. Well, that's an argument against you, isn't it? They've looked at, they've decided that shrimp trawlers don't need enforcement. Well, we don't know that. What we know is they haven't done anything. Whether anybody in the EPA. That's comfort to Judge Richardson's daughter. They haven't done anything in her case either, but they might. Well, let me talk about, may I talk for a minute about the major questions, doctor? So the Supreme Court, in talking about what they were looking at, said early on that EPA's own modeling concluded that the rule would entail billions of dollars in compliance costs, require the retirement of dozens of coal-fired plants, and eliminate tens of thousands of jobs across various sectors. It would reduce the, excuse me, a study by the Energy Information Administration found that it would reduce the gross domestic product by at least a trillion dollars. It goes on to talk about an agency decision of vast economic and political significance. These are the kinds of things it was looking at in major questions. When it just talks about major questions, something that's going to be an upheaval to the entire U.S. economy, like the Clean Power Act, arguably would have been. I mean, I think whether you think of the Clean Power Act was good or bad, everyone would agree it was going to be a major upheaval to the entire economy. Every state, Iowa, Minnesota, every state was going to be affected by it. This case, we're talking, it's very important to us, but we're talking about estuarine waters along the coast of basically North and South Carolina. But if you're right, it applies to all commercial fishing operations, right? Even on the dead, even if you adopted some version that just limited it to dead fish. It's all commercial fishing operations, right? And the point is, no commercial fishery operation can both comply with the Clean Water Act and the state requirements to return, state and federal requirements, to return by catch to the water. So it says you cannot engage in commercial fishing. Your Honor, thank you for the question. I do disagree with that statement. Help me understand why. So it does not apply to all commercial fishing because most fishing does not involve the killing of great quantities of other fish they were not after. Now if you're after the fish, of course they die and you take them to the market and they get sold and people eat them. It's only because it's great quantities. So if I have any bycatch, so if I'm a crabber and as a result some extra fish die in the crab traps, right? Or I'm a long line fisher and I catch some fish that I don't want to catch and they perish as a result, right? Or any other kind of trawler that ends up in the same world. I can't figure out what example of commercial fishing doesn't result in the incidental kill of some fish that are then returned to the water. I understand your point, Your Honor. And I think that a lot of this line of questioning goes to was the Clean Water Act a good law or not? Because there is no question what the list of pollutants is. And there is no question, as Your Honor has pointed out, that if it's heat, yeah, there's some heat coming out of an outboard motor. If it's rocks, yeah, my daughter throws rocks in the water. That's the way the act is structured. That's what Congress gave us. If we don't like it, we can get elected to Congress and change it. But Congress also gave us laws that say the state has the right to manage the natural resources, including fish and shrimp, in its waters. That's the Submerged Lands Act. But Congress also gave us the Magnuson-Stevens Act, right, which has a long series of requirements and that the state has implemented its own requirements. So we're not just talking about one law. We're talking about this conflict that happens if we read the Clean Water Act as broadly as you're asking us to. We have to look at everything that Congress has said about this area. And it seems to suggest that they don't intend to cover these fish under the Clean Water Act, but instead under different acts of Congress. Thank you, Judge Rushing. And that is something I wanted to talk about because the appellees spend much of their briefing on this argument that there's other fishing laws that are somehow in conflict or My colleague, Shannon Arata, who wasn't able to be here today, had a great line. She said there are a lot of strong statements in that brief, but not much law. And that's correct, yeah. The Magnuson-Stevens Act says some things. Some other acts say some things. But none of those acts, despite language in the brief, they have shown us no statute or regulation, present or past, that tells us that it is a traditional role of the fisheries management laws to say what happens in terms of discarding pollutants back into the water, or if we want to narrow it down, what happens with regard to discarding dead fish in large quantities back into the water. And I do keep saying large quantities, and that's on purpose, because what will happen here is that EPA will step in then and say, okay, all right, we get it. Fourth Circuit's told us what we have to do. We're going to set up a permitting system for this. We're going to set de minimis exemptions. We may issue some general permits that say everybody who's doing commercial fishing and has less than 5,000 pounds of dead fish, you're good. You've got a general permit. You don't have to do anything else. That's what they do. That's what they do with all of these categories of pollutants. That's how the Clean Water Act actually works. Thank you, Counsel. We've got some time for you in reply. We're happy to hear from you. Good morning, and may it please the Court. Congress does not hide whales in fish bowls. And so the District Court was right that by including biological materials in a list of pollutants, Congress did not regulate bycatch under the Clean Water Act. And Congress did not thus outlaw the shrimping and fishing industries in which bycatch is inevitable. And Congress didn't hide that sea change from the EPA and everyone else for the last 50 years. Today, I'd like to address three specific reasons why the Clean Water Act does not regulate bycatch. And first, I'll start with the major questions doctrine, which seems to be the most timely reason for affirming the District Court. And that doctrine gives us profound reason for skepticism that 50 years ago, Congress actually put the EPA in charge of regulating bycatch as part of fisheries management. And this case has all the hallmarks of the major questions doctrine, as the Supreme Court just applied it in West Virginia. So first, there have been decades of EPA silence, 50 years where the EPA has not sought to regulate bycatch, has not sought to regulate fisheries management, which is precisely the upshot of what the plaintiff's theory would do here. Second, at best, there's vague text in the Clean Water Act that would support the application of the power that the plaintiffs want to give the EPA here. Third, the technical and policy expertise that is necessary to manage fisheries, to determine how much bycatch is or is not appropriate, is beyond the EPA's ken. They've never claimed that they have the expertise in fisheries management that would be needed to decide how much bycatch is too much, how much is enough for one fishery versus another fishery. And last, indeed, this would be an existential threat to industry. As to commercial shrimping, you don't have to take my word for it, because that's precisely the relief that the plaintiffs are asking. On pages 30 and 31 of the JA, they ask for an injunction that would, in effect and in practice, shut us down. But Judge Richardson, as you recognized, it's not just commercial shrimpers that would be affected by this, commercial fishermen too. There's bycatch in just about any fishery. You never know what you're going to pull up when you go fishing. But beyond commercial shrimping and commercial fishing, it's not at all clear to me why my friend's own clients would be safe from the rule that he wants, why recreational fishermen would be safe. Because they too use bait, which on their theory is the fish and fish of undesired species that are returned to the waters, alive sometimes and dead sometimes. So I understood him to say that it's within the EPA's discretion where to draw the line of which bycatch is too much and which is fine. But that's not something that Congress put within the EPA's discretion. There is one major difference between this case and West Virginia, of course, and that is that in West Virginia, it was the EPA that the Supreme Court held was trying to aggrandize its own authority. But here, it is plaintiffs who seek to force that authority on EPA that in 50 years has never tried to exercise it. So briefly, two more reasons why the District Court should be affirmed. First is the statutory federalism embodied in the Clean Water Act, and Section 1370 gives us a rule of construction for the Clean Water Act in particular that's really dispositive here. And that rule says that absent a clear statement, nothing in the Clean Water Act shall be construed as impairing or in any manner affecting any right or jurisdiction of the states over their waters. And Judge Rushing, you're exactly right. The Submerged Lands Act gives vested title and power to the states to manage and use the natural resources in the lands underneath their navigable waters and those navigable waters themselves, and in particular, defines those natural resources as fish and shrimp, as relevant here. And for its part, North Carolina does unambiguously exercise that jurisdiction. The regulations dealing with fisheries management in North Carolina are extensive. The DMF, the Division of Marine Fisheries, has created extensive records of what they're doing and why, and the amendments to their shrimp fisheries management plans. And so it's implausible that Congress reversed its long-standing policy of recognizing state jurisdiction over those waters, over those fisheries in those waters, through a vague reference to biological materials in the Clean Water Act. And last, there would be interference with the bycatch mitigation provisions of the Mangus and Stevens Act if the District Court were reversed. Can you, all right, I wanted to get to the third one. Can you go back on the court seems to do in West Virginia versus EPA is determine, like, is there a plausible textual understanding the other way, right? That if there's clarity, another way of saying this, is you can't have a major questions case if the statute itself is clear that it is providing that authority to the agency, right? And so in West Virginia v. EPA, the court goes through and explains why there's a lack of clarity there, and that that is what ultimately brings it within the doctrine. Can you help me understand why biological materials lacks that kind of clarity? I mean, it seems to me to be, like, actually somewhat of a quite clear term and extraordinarily broad. And so just from the textual understanding of the phrase, why, even if I thought every other aspect of the major question doctrine applied, why wouldn't I say, as your colleague suggests, maybe this is terrible policy, but this happens to be an instance in which the law is, like, quite clear that biological materials means, like, things that are effectively made of carbon, if we want to go too far down that road. But you get the idea. Two reasons, your honor. One is that we can do what the Ninth Circuit did in the Hammersley case, which is look at the Noskutura-Soki-East canon, and look at some of the other items in that list. And what the Ninth Circuit... Help me understand. So can I stop you there? Because I find that one interesting, too. The court there, when it goes through and describes, instead of saying that pollutant means these things, it repeatedly describes it as includes, right? As if it's a list of examples, right? It says it's an illustrative list of examples. But I don't read the statute that way. It doesn't say pollutant includes sand, rock, and biological materials, right? It says it means that. And so it strikes me that the analysis of the Ninth Circuit changes the definitional to an illustrative example. And in doing so, that's how it makes its canon work. Am I missing that? I mean, do you understand what I'm saying? I think I do, your honor. But frankly, given the number and breadth of things in that list, I'm not sure there's a lot of daylight between means and includes in this particular context. But if it says includes, right? So one way of thinking about that, I don't want to say pollutant includes these things. Well, then we still are looking at the word pollutant to provide some substance, right? Because that means that the pollutant, these are examples of pollutant, but they don't define pollutant. And so we would look at the meaning of pollutant, the ordinary understanding of pollutant. But we don't look at the ordinary understanding of a word where it is specifically defined by statute. And here, instead of saying these are examples, it says that's what it is. It means biological materials. It's not an example of pollutant. Pollutant means biological material. Right, your honor. I think either way, we're trying to ascertain the meaning of biological materials. And I don't understand the plaintiffs to allege that there is some, even if pollutants includes these things, that there's a freestanding understanding of pollutant that would apply here. The argument, as I said, these bycatch materials are biological materials, and that's why they're caught up in the Clean Water Act. But as the Ninth Circuit said in Hammersley, that those surrounding terms tend to deal with the byproduct of an industrial process. And so one reason that you would find some ambiguity in the statute, whether or not you need that for the major questions doctrine, you would find ambiguity because biological materials shouldn't just be anything that So that's one answer. But the second answer looks at Section 1328 of the Clean Water Act, which addresses aquaculture in particular. So when Congress wanted to regulate fish under the Clean Water Act, it knew how to do that. And it did that in Section 1328. And under the plaintiff's theory, Section 1328 would be entirely superfluous because fish would be regulated under biological materials already. And we know that's not case because Congress felt it necessary to add that specific section in 1328. But I'm not familiar with 1328. Does 1328 prohibit the discharge of fish into the waters of the United States? No, it gives the EPA specific authority to regulate aquaculture. Right. So but that's only if you're farming fish, right? Exactly. So wouldn't apply in the scenario we've got here. Nobody's suggesting this is about farming fish. So I guess I'm having a little trouble understanding why fish farming would would render a prohibition on discharging fish at all into the waters. Those just seem like totally different questions, right? Like if you farm fish, fine, this is how you do it. But what you can't do is let them out their cage. But the way that aquaculture fish farming generally works, Your Honor, is that those Congress does know how to address the regulation of putting fish into water when it wants to, and it did that in Section 1328. And my point is only that it hasn't done anything remotely like that here. And so if I may, Your Honor, I'll just briefly conclude with the Magnuson-Stevens Act, which does tell fisheries managers to minimize bycatch and the resulting mortality, but only to the extent practicable. Congress made that policy choice that it's not something that as Your Honor pointed out, bycatch is inevitable in just about any fishery. And so Congress did not take the extraordinary step of eliminating all bycatch or requiring fisheries managers to eliminate all of it. But that provision, that directive to mitigate bycatch without necessarily eliminating it, that would be superfluous if Congress had already decided in 1972 that without a permit, bycatch is completely illegal already. So help me understand that one too. I'm sorry. Because you might regulate bycatch even for permitted vessels, I think would be your colleague's argument, right? That like, you could both fall under that act and the regulations that apply and require, in theory, a Clean Water Act permit to engage in fishing at all. You just need two different ones. In theory, Your Honor, but in 1996, when Congress enacted the Sustainable Fisheries Act, which amended the MSA, Congress, there were no permits then. There still are no permits now from the EPA covering bycatch. So if Congress is going to say you need to minimize bycatch, on the plaintiff's theory, what Congress did in 1996 to the Magnuson-Stevens Act was entirely superfluous because it was already illegal, period. And as Judge Rushing pointed out, this is exactly the scenario that the Supreme Court addressed in Train, where the 10th Circuit said radioactive materials means radioactive materials. And the Supreme Court reversed because it wasn't going to interpret pollutant in the Clean Water Act to encroach on other targeted regulatory schemes. There, under the Atomic Energy Act, here, under the Magnuson-Stevens Act, and in the many, many state fishery management regulation establishments. So if the Court has no further questions, we ask you to affirm the dismissal. Ken, since I've got some time with you, we've talked mostly about biological materials. Can you talk for a minute, if you can, about discharge and whether this counts as a discharge? In particular, I'm interested if you've got thoughts on how our decision in Deaton is affected by L.A. County flood and the line of cases that follow it. Yeah, so my primary answer, Your Honor, would be to repeat most of what I just said, that both as a major question and under Section 1370 and the Magnuson-Stevens Act, this is a case about how to manage fishery resources. And so for all those same reasons that Congress didn't regulate bycatch using this reference to biological materials, Congress didn't outlaw or put EPA in charge of permitting the use of specific fish tackle in the same statute. So that's our primary response for those. I mean, the District Court was also correct that as a technical matter, there is an Army Corps of Engineers regulation that says this section does not apply to incidental fallback, and that's correct. But I think the easiest way to dispose of it is using the same analysis that would apply to the bycatch issue as well. Okay. Thank you, Your Honor. So, all right, sorry, last thing since you're here. No, I'm good. Thank you. Thank you, Your Honor. Appreciate you, counsel. Mr. Conner, we've got a few more minutes for you. Yes, sir. Thank you. So my learned colleague and his team go off the track in a couple of ways. One is to say that these fisheries laws have occupied the space. As I started to say earlier, in their brief, although there are a lot of strong statements about that, they provided us with not a single citation to any law or regulation in the Magnuson-Stevens Act, any state laws, anywhere else that regulates how you put dead fish back in the water, whether you can do it, how much of it you can do, how you do it, none of that. It's not regulated. It's not a traditional fisheries management issue. Fisheries management is about what can you catch and what can you keep if you catch it. How long does it have to be? How heavy does it have to be? How many of them can you have per day? Are you familiar with the turtle excluders? I am. Is that part of fisheries management? It strikes me that it is, right? Because the whole point is it's about not catching turtles. I guess I was getting too technical. My background is in biology. A turtle is not a fish, so I would say it's not fisheries management, but it certainly is management of how they're fishing. The point is it's not just about what they're bringing in. It's also about the manner in which they're engaging. In which they're catching things. We're not talking about that. Turtles are not catching things. Or not catching things. Like bycatch. Yes, sir, and thank you for that because that's the other point. The next point I wanted to make about my learned colleague's statements and briefing. We're not asking you to regulate bycatch. We're not asking you to say right now they're catching 34 million pounds of bycatch. They can only catch 20 million or zero or any other number. Under the Clean Water Act, they can catch as many bycatch as they want because that's not what the Clean Water Act is about. It is not a fisheries management statute, and we're not arguing that it is. They can catch things the way they want to as long as they're in compliance with the fisheries laws, in the season they want to, and in the amounts they want to, as long as they're in compliance with the fisheries management laws. This is not a marine fisheries, the North Carolina Division of Marine Fisheries. We did and thought better of it, yes, your honor. But you argue now that they so don't occupy the space, this just does not apply, and yet that was who you initially sued. It was one of the entities we initially sued, yes, ma'am, and it was about the public trust doctrine. If I remember, it's been a couple years ago and I haven't thought about it recently, but we were talking specifically about the public trust doctrine. There were some negative decisions that had come down recently. We dismissed them for that reason. But yes, the point remains that this is not a fisheries management case. We're not asking this court to rule on anything about how fishing is done, about how much bycatch there can be. What we're talking about is the Clean Water Act, which talks about putting dead fish in the water, and I want to go back to one of the early questions. Judge Rushing, I think it was you. I don't want to take you off track, but you said you're not making any argument about how fishing is done, but your dredging argument is about how fishing is done, right? Now, I know that's a separate argument, but you're raising that on appeal. That is an argument about trawling, right, and how it disturbs the seabed. Sure, that's a great point. Thank you. And I was focused on the bycatch disposal issue, the dead fish disposal issue, but you're right. The dredging is a question of how it's done because dredging stirs up the sediment. We believe under this court's previous decision in Deaton, that's clearly a violation. You'll remember, of course, that Deaton says in the digging a ditch, even though the dirt you dig up is the same dirt you're putting back down, that dirt is transformed by being dug from dirt into a pollutant. I've got a quote to read you, but I don't have a lot of time. What is the harm that is caused by the suspension, resuspension of the sediment? Your complaint has a lot of, it talks about harm caused by the physical act of trawling, pulling something along, but your argument has to be that the sediment itself is causing a harm if you're going to make a dredging claim. Yes. What is the harm that the sediment is causing to aquatic function? Yes, Your Honor. It's a good question as always, and we do allege that in the complaint. Our reply brief goes through paragraph by paragraph where that is, and I'm sorry I don't have it. I read those, and it looked like all of the harm was from the trawling, disturbing habitats, et cetera. It wasn't harm from the sediment. So what happens with the sediment is that it does get resuspended, and then it falls back out in a different place. When it falls back out in a different place, it chokes, I'm a scuba diver, I don't know if you all have done that, but there's lots of things that live in little holes under the bottom of the ocean, and those holes get filled up by the sediment falling down. Seagrass gets covered with it, like in the U.S. v. MCC case. Is that in your complaint? I probably didn't say it that specifically, Your Honor. I want to go back, though, to this. I don't want to hit it too hard, but I've got very little time. We're not talking about regulating fisheries. We're not talking about regulating how much bycatch we can get. What we're talking about is down the middle of the fairway, Clean Water Act issue, which is can they put dead fish back in the water? Those fish, may I have just a few seconds? The fish have been transformed by a human process. That's about live fish versus dead fish. Live fish, they've been pulled up and then they've been put back. I don't think that's much of a transformation by a human process. Pulling fish out of the water or other marine organisms out of the water and letting them die or killing them, that's about as transformative as you can get. Go from alive to dead, and that's done by humans. That's a transformative human process, and when that goes back in, that's a pollutant under the clear language of the Clean Water Act. Thank you, counsel. As you probably well know, we normally come down and we value the opportunity to shake your hand and say hello in a little more personal level. We obviously have not gotten back to that tradition. We hope to soon, and we hope to see you back here, but we certainly appreciate your help with this case today.
judges: Julius N. Richardson, Allison J. Rushing, Sherri A. Lydon